UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANIEL J. SARACINA,

                                  Plaintiff,                        9:17-cv-864 (BKS/DJS)

v.

DUBREY, et al.,

                                  Defendants.
_____

**Appearances:**

*For Plaintiff:*
Steven M. Cohen
HoganWillig, PLLC
2410 North Forest Rd., Ste. 301
Amherst, NY 14068

*For Defendants:*
Letitia James
Attorney General of the State of New York
Helena Pederson
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

      Plaintiff Daniel J. Saracina brings this action under 42 U.S.C. § 1983 against Defendants Dale G. DuBrey, Timothy J. Flint, Eric J. Monica, John J. Taylor, and Jeremy G. Youngs for excessive force in violation of the Eighth Amendment. (Dkt. No. 1). Defendants Flint, Taylor, and Youngs move for summary judgment under Fed. R. Civ. P. 56 on the ground that Plaintiff cannot establish their personal involvement in the alleged use of excessive force. (Dkt. No. 76-

1). Plaintiff has no objection to dismissing the claims against Defendants Flint and Taylor, but opposes Defendants' motion as to Defendant Youngs. (Dkt. No. 78-1). For the reasons discussed below, Defendants' motion for summary judgment is granted.

## II.     FACTS[1]

On August 9, 2017, Plaintiff was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and an inmate at the Bare Hill Correctional Facility in Malone, New York. (Dkt. No. 76-7, at 15). That day, after completing his yard porter duties, Plaintiff returned to his housing unit in the L-1 dorm. (*Id.* at 19–20). Plaintiff testified that after he entered the dorm he went to the officers' desk "and grabbed the clipboard to sign up for the phone." (*Id.* at 22). Defendant Youngs, a Bare Hill Corrections Officer who was assigned to the L-1 dorm, "snatched it from [Plaintiff's] hands" and said: "what the fuck is wrong with you? Didn't you just hear my speech?" (*Id.* at 23–24; Dkt. No. 76-2, ¶¶ 2, 5). Plaintiff replied that he "just got back from work," had not "hear[d] anything" and "was just signing up for the phone." (Dkt. No. 76-7, at 24). Youngs told Plaintiff to "go to [his] cube." (*Id.*).[2] When Plaintiff returned to his cube, he learned from other inmates that there had been a problem with "gang members . . . over something with the phone while [Plaintiff] was gone." (*Id.* at 24–25).

---

[1] Defendants filed a Statement of Material Facts, (Dkt No. 76-2), with citations to the record. Plaintiff failed to respond to Defendants' Statement of Material Facts with a response mirroring their assertions, admitting or denying each assertion, as required by Local Rule 56.1(b). Instead, Plaintiff filed a "Statement of Facts," with citations to the record, sworn to by his attorney. (Dkt. No. 78). The Court has, in its discretion opted to overlook Plaintiff's violation of the local rules and conduct a review of the entire record. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). The Court, however, cautions Plaintiff's counsel that it may not overlook future rule violations. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[2] The dorm area of L-1 is divided into 50 housing unit "cubes," each with dividers about five feet high. (Dkt. No. 76-7, at 20).

Plaintiff testified that approximately fifteen to twenty minutes after returning to his cube, Defendant DuBrey, a Bare Hill Corrections Officer, and Youngs' "Area Supervisor," walked into the L-1 dorm area with five other officers. (Dkt. No. 76-7, at 25–27; Dkt. No. 78-12, ¶ 6). DuBrey said "'I bet you fuckers didn't know I was back,'" and "if I have to come back to this fucking house one more time, I'm going to beat one of you guys down right here in front of everybody and then I'm going to haul your ass out of here and put you in the box." (Dkt. No. 76-7, at 27–29). After DuBrey left, Youngs told the inmates in the dorm area that they were "on the count"—meaning each inmate had to stay in his cube and could leave only to use the bathroom. (*Id.* at 30–31). Youngs also told the inmates that "he was locking the phone booths." (*Id.* at 38).

Plaintiff and Youngs provide different versions of what happened next. According to Plaintiff, after being put "on the count," Plaintiff "filled out a slip to Dep of Security Felix . . . [t]o find out how long the phones were going to be out of service." (*Id.* at 37). Plaintiff then left his cube to go to the bathroom, first stopping by the officers' desk to leave his ID, per bathroom procedure, and drop the slip to Deputy of Security Felix and a letter into the mailbox, which was near the desk. (*Id.* at 37–39). Youngs asked Plaintiff what he put into the mailbox, and Plaintiff responded that it was "mail or a slip" and stated that he did not "have to explain to [Youngs] who" he writes to. (*Id.* at 41). Youngs said "you do" have to explain, that he "want[ed] to know" what Plaintiff had written, that he was "going to find out," and sent Plaintiff back to his cube. (*Id.* at 41–42). Plaintiff returned to his cube. (*Id.* at 42). A "few minutes" later, Youngs took Plaintiff "out to the rec room" and began "yelling" and "screaming" that he "want[ed] to know what the fuck [Plaintiff] put inside of that box." (*Id.* at 42–43).

While in the rec room, Plaintiff saw two vans arrive at the L-1 dorm. (*Id.* at 45–46). Plaintiff states that DuBrey entered the rec room first and told Plaintiff he was a "stupid mother

3

fucker," and then went to the officer's desk, while Youngs was still in the rec room. (*Id.* at 46–47). Plaintiff states that a couple of the officers that had come in with DuBrey held Plaintiff's hands or forearms, brought him into the breezeway, and the door to the rec room was then closed behind them. (Dkt. No 76-7, at 46, 48–49, 51–52).[3] Plaintiff testified that while in the breezeway, the officers put Plaintiff in a pat-frisk position and kicked his legs out and then asked Plaintiff "if [he] had anything on [him]." (*Id.* at 49). There was then a "punch to one of the sides of [Plaintiff's] face," and then "a couple of punches to [his] side." (*Id.* at 50). DuBrey then opened the door from the rec room to the breezeway and told the officers to put Plaintiff in handcuffs and then went back inside. (*Id.* at 51–52). The officers handcuffed Plaintiff and led him outside into the van. (*Id.* at 54).

Youngs recounts this incident differently. Youngs states in his declaration that he "witnessed [Plaintiff] leave his cube without permission and place an unknown object in the mailbox." (Dkt. No. 76-12, at ¶ 7). According to Youngs, after Plaintiff placed "something in the mail box," Youngs "gave him a direct order to return to his cube" and he refused, becoming "agitated . . . and aggressive." (Dkt. No. 76-8, at 38, 41). Youngs states that Plaintiff then raised his voice and acted aggressively towards Youngs, refusing to return to his cube, slapping his hand on the officer's workstation, and threatening Youngs that his "[f]amily on the outside already knows about you, so watch out." (Dkt. No. 76-6, at 112). This "created a disturbance" and caught the attention of other inmates. (Dkt. No. 76-8, at 44). Youngs then "contacted [his] area supervisor," DuBrey, and told him that Youngs "was having an issue with an inmate." (Dkt.

---

[3] The breezeway is approximately "six feet by five feet" with one door that leads to a driveway outside and a second door that leads into a recreation room ("rec room"). (Dkt. No. 76-8, at 15, 34). The rec room and dorm area are divided by a glass window and a door. (Dkt. No. 76-7, at 32, 35). A corrections officer is posted inside the dorm area at an "officers' podium" or desk in front of the window dividing the dorm area from the rec room. (*Id.* at 31). From the officers' podium, an officer could "turn around" and see the rec room through the window behind the podium. (*Id.* at 35).

No. 76-9, at 40). DuBrey received authorization to place Plaintiff in Special Housing and told Youngs that he was on his way. (*Id.* at 41–47).

According to Youngs, to "avoid further escalating the situation. [Youngs] directed [Plaintiff] into the recreation room" and Plaintiff continued to speak in an "aggressive, loud manner." (Dkt. No. 76-12, ¶ 11; Dkt. No. 76-8, at 50). A Corrections Officer who "had been stationed in the Yard . . . heard [Plaintiff] yelling[ and] came to assist. (Dkt. No. 76-12, ¶ 12). Youngs testified that the officer "took [Plaintiff]" and Youngs returned to his desk in the dorm area. (Dkt. No. 76-8, at 53). Youngs testified that after DuBrey arrived at the recreation room, the officer who had taken Plaintiff "turned [Plaintiff] over to [] DuBrey and the rounds men," who "escorted" Plaintiff to the Special Housing Unit ('SHU'). (Dkt. No. 76-12, ¶ 15). Youngs stated that he could not see the breezeway from his desk, and was not "in the breezeway when the alleged altercation took place between [Plaintiff] and the other officers." (Dkt. No. 76-8, at 59, 74). Plaintiff admits that Youngs never touched him "during the incident." (Dkt. No. 76-7, at 112).

Plaintiff was then driven to SHU, where DuBrey, Monica, and Plaintiff went into a search room. (Dkt. No. 76-7, at 56–58). During his time in the search room, Plaintiff heard "a bunch of people talking," and "people coming in," maybe seven or eight total, but he did not think Youngs was there. (Dkt. No. 76-7, at 62, 112). He alleges that the officers then took the cuffs off him and placed him in a pat-frisk position on the wall. (*Id.* at 59–60). He took off his shirt, shoes, and pants. (*Id.* at 61–62). Plaintiff testified that after being pat-frisked, he felt something that "felt like a towel" "go around [his] neck real fast," and tried to "get [his] hands in there" to take it off. (*Id.* at 64). "Two people grabbed [his] arms" on each side. (*Id.* at 65). He put his feet on the wall to try to "push back to take the pressure off of the towel," pushing his back

5

against DuBrey, the person choking him. (*Id.* at 66). He slid to the ground, and Plaintiff reports that he was "punched in the face numerous times," while his arms were held down. (*Id.* at 68–69). He then reports losing consciousness and has described alternatively waking up in an ambulance, (*id.* at 71), in the hospital, (Dkt. No. 76-6, at 83), or "on the floor, being kicked and punched," (*id.* at 82).

In contrast, Defendant DuBrey states that Officer Monica informed Plaintiff of the procedure, removed his hand restraints, and had him place his hands on the wall. (Dkt. No. 76-9, at 67–68). Then, Plaintiff pushed off the wall and shoved Officer Monica into a garbage can, grabbed DuBrey by the shirt, and swung his fist at DuBrey's face. (*Id.* at 68–69). DuBrey ducked, and then "came up" and hit Plaintiff with a "closed right fist" in the upper temple area. (*Id.* at 69). Plaintiff fell to the floor. (*Id.*). He was on his hands and knees "trying to stand up to reengage," when DuBrey "jumped on him" with his "right knee on his back . . . forcing [Plaintiff] to the ground." (*Id.* at 70). Monica and Dubrey held Plaintiff down until he "calmed down enough" for DuBrey and Monica to put his hands behind his back, stand him up, and hold him against the wall. (*Id.* at 70, 76–77). DuBrey called the commander following this use of force, and DuBrey and Monica were relieved by other staff. (*Id.* at 77–78).

Medical records indicate that Plaintiff was then transported to Alice Hyde Medical Center, "where he was treated for a rib fracture, punctured lung, and multiple injuries to his right eye, right ear, right side, neck, back, and head causing swelling, bruising, and bleeding to the injured areas." (Dkt. No. 78, at ¶ 22; Dkt. No. 78-3, at 80).

### III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see*

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)

7

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

IV. DISCUSSION

    A. **Defendants Taylor and Flint**

Defendants argue that Plaintiff has failed to make a sufficient showing that Defendants Taylor and Flint were personally involved in the alleged excessive force incident. (Dkt. No. 76-1, at 7). They point out that, in his deposition, Plaintiff acknowledged that "Lieutenant Taylor is a different Taylor than the Officer Taylor that was in the situation," and that the record reflects that, whereas an Officer Joshua J. Flint was working in SHU on the date in question, Defendant Lieutenant Timothy J. Flint was not. (*Id.* at 9 (citing Dkt. No. 76-7, at 80, 112)). Plaintiff agrees that Defendants Flint and Taylor were "not involved in the use of excessive force," and states that he is "prepared to move the Court to amend the caption," with "no objections to dismissing the claims against Defendant Flint and Defendant Taylor." (Dkt. No. 78-1, at 4, 5).

The Court finds that there is no issue of material fact as to the involvement of Defendants Flint and Taylor, and considering the agreement of both parties, dismisses the claims against them.

    B. **Defendant Youngs**

Defendants seek summary judgment dismissing Defendant Youngs from this action on the grounds that there is no evidence that he was personally involved in the alleged excessive force incident. (Dkt. No. 76-1, at 7–9). Plaintiff opposes summary judgment, arguing that there is

a question of fact as to whether Defendant Youngs failed to intervene to prevent the use of excessive force. (Dkt. No. 78-1, at 3–4).[4]

A prisoner raising an excessive force claim under § 1983 must show that there has been a violation of the Eighth Amendment ban against cruel and unusual punishment. *Randolph v. Griffin*, 816 F. App'x 520, 522 (2d Cir. 2020); *Wright*, 554 F.3d at 268. "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright*, 554 F.3d at 268 (citing *Hudson v. McMillian*, 503 U.S. 1, 7–8 (1992)). The subjective component requires a showing that "defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct," turning on whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Randolph*, 816 F. App'x at 522 (quoting *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016)); *Wright*, 554 F.3d at 268 (citing *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (internal quotations omitted)). The objective component looks to the harm "in light of contemporary standards of decency," asking whether "the alleged wrongdoing was objectively harmful enough or sufficiently serious to reach constitutional dimensions." *Randolph*, 816 F. App'x at 523

---

[4] Defendants reply that "there is no 'failure to intervene' claim before the Court," as such a claim was not raised in the Complaint. (Dkt. No. 80, at 4–5). The Court need not address this argument as even assuming Plaintiff properly pled a failure to intervene claim, the claim fails on the merits.

Defendants also argue that the "heated conversations and finger pointing," and alleged "verbal harassment and threats" Youngs directed at Plaintiff do not constitute excessive force. (Dkt. No. 80, at 5–6). Plaintiff has not asserted this as a basis for excessive force. In any event, the Court notes that "heated conversations and finger pointing" and "verbal harassment and threats," without any physical contact or physical harm, would not constitute excessive force. *See Wright*, 554 F.3d at 268–69 (requiring for the objective component of a Eight Amendment claim that the alleged wrongdoing must be "'harmful enough' to establish a constitutional violation," and that "de minimis uses of physical force" do not satisfy the criteria unless they are "of a sort repugnant to the conscience of mankind") (quoting *Hudson v. McMillian*, 503 U.S. 1, 8, 10 (1992)); *Walker v. Fierro*, No. 17-cv-5245, 2019 WL 6841798, at *3, 2019 U.S. Dist. LEXIS 218268, at *7 (S.D.N.Y. Dec. 13, 2019) (finding that "[a]llegations of verbal harassment fall short of a Section 1983 claim" in the context of an Eighth Amendment excessive force case).

(quoting *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015)); *Wright*, 554 F.3d at 268 (citing *Hudson*, 503 U.S. at 8). However, "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency are always violated. . . . This is true whether or not significant injury is evident." *Wright*, 554 F.3d at 268–69 (citing *Hudson*, 503 U.S. at 9) (internal quotations omitted).

Furthermore, "[p]rison officials can be held liable under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *Randolph*, 816 F. App'x at 523. A corrections officer may be liable under a failure-to-intervene theory if: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. Mar. 24, 2008). "A defendant who is not in the vicinity of the alleged constitutional violation . . . cannot be held liable because he lacked reasonable opportunity to intervene." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342–43 (N.D.N.Y. 2010) (citing *Ford v. Moore*, 237 F.3d 156, 163 (2d Cir. 2001)).

Finally, personal involvement is an essential element of any claim brought under § 1983. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Thus, "a plaintiff must . . . prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

There is no evidence that Youngs was present in SHU during the alleged assault there; Plaintiff testified that he does not think Youngs was there. (Dkt. No 76-7, at 112). Plaintiff does not assert that there is any triable issue regarding Youngs' personal involvement in that assault.

(Dkt. No. 78-1, at 3–4). Plaintiff instead argues that Youngs could have intervened to prevent the assault in SHU because Youngs "permitted Plaintiff to be released" to DuBrey's custody "approximately thirty minutes after DuBrey threatened inmates with physical harm" and Youngs "knew or should have known" of DuBrey's reputation for "roughing up inmates." (*Id.*). Plaintiff has not cited any caselaw support for this argument.

      To be held liable for failing to intervene, an officer must have been *in the vicinity* of the harm, such that he had a reasonable opportunity to intervene. *See Livingston*, 2021 WL 3888283, at *4, 2021 U.S. Dist. LEXIS 145360, at *13–*14; *Tafari*, 714 F. Supp. 2d at 341 (emphasis added). Since Plaintiff has failed to raise evidence from which a jury could find that he had a reasonable opportunity to intervene in the alleged assault in SHU, Defendant Youngs is entitled to summary judgment on a failure to intervene theory.[5]

      Plaintiff next contends that because Youngs was "present in the L-1 Dorm when Plaintiff was being punched" in the breezeway, there is a "triable question of fact as to whether Defendant Youngs could have intervened" to prevent that use of force. (Dkt. No. 78-1, at 4). However, Plaintiff has failed to raise evidence from which a jury could find that Youngs had a reasonable opportunity to intervene to prevent the alleged use of force in the breezeway. Plaintiff testified that the officers that came with DuBrey took him to the breezeway while Youngs was still in the rec room, but that the door between the rec room and the breezeway was closed during the pat-frisk incident. (Dkt. No. 76-7, at 51–52). Although Plaintiff and Youngs both testified that there was a window from the officer's desk looking into the rec room, there is no evidence that there

---

[5] To the extent the nature of Plaintiff's arguments could be read to suggest a "failure to protect" claim, there is no "failure to protect" claim alleged in this case; the Complaint does not advance such a claim, and unlike the failure to intervene claim, none of the parties' submissions in connection with the instant motion refer to a failure to protect claim.

11

was a way to even see into the breezeway from inside the rec room or from the officer's table. (Dkt. No. 76-8, at 74; Dkt. No. 76-7, at 45).[6]

The Court finds that Plaintiff has offered no evidence from which a jury could find that Defendant Youngs was "present" or "in the vicinity" of either the breezeway or the SHU during the alleged assaults, such that he a realistic opportunity to intervene. *See Livingston*, 2021 WL 3888283, at *4, 2021 U.S. Dist. LEXIS 145360, at *13–*14; *Jean-Laurent*, 540 F. Supp. 2d at 512. Thus, Plaintiff has failed to adduce facts showing a genuine issue for trial and Defendant Youngs is entitled to summary judgment.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 76) is **GRANTED**; and it is further

**ORDERED** that all claims against Defendants Taylor, Youngs, and Flint are **DISMISSED with prejudice** in their entirety.

**IT IS SO ORDERED.**

Dated: October 13, 2021
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[6] Youngs testified that he was "not present" while Plaintiff was pat-frisked. (Dkt. No. 76-8, at 74). He stated that after Plaintiff was taken from the rec room, he went back to his desk, could not see the breezeway from there, and "did not see what the other officer[s] did with respect to [Plaintiff]." (*Id.* at 74, 78).